### WOOD v. STATE.

(Court of Criminal Appeals of Texas. Oct. 30, 1912.)

1. HOMICIDE (§ 309*)—MANSLAUGHTER—EVIDENCE—INSTRUCTIONS.

Where the beginning of the difficulty between accused and decedent resulting in decedent's death was in doubt, and accused showed that decedent and his brother called him a vile name, provoking the difficulty, while decedent's brother showed that decedent and accused were fighting, and that the brother struck accused, inflicting pain and causing bloodshed, and that accused thereupon killed decedent, the failure to submit the issue of manslaughter was erroneous; for, though the language was not adequate cause for manslaughter, it might be a provocation to a difficulty.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 649, 650, 652–655; Dec. Dig. § 309.*]

2. HOMICIDE (§ 307*)—ISSUES—INSTRUCTIONS.

Where a state of facts exists favorable to accused, which will raise the issue of an inferior degree of homicide, not submitted, it is error to fail to so charge as to properly submit the inferior degree.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 638–641; Dec. Dig. § 307.*]

Appeal from District Court, Cass County; P. A. Turner, Judge.

T. G. Wood was convicted of murder in the second degree, and he appeals. Reversed and remanded.

O'Neal & Figures and Hill Stewart, all of Atlanta, for appellant. C. E. Lane, Asst. Atty. Gen., for the State.

DAVIDSON, P. J. This conviction was for murder in the second degree; the punishment being assessed at seven years' confinement in the penitentiary.

[1] The most serious contention for reversal is the failure of the court to charge on manslaughter. The evidence is voluminous, and goes into great detail and with considerable indefiniteness; there being a great deal of repetition and many incomprehensible statements concerning the location of the parties, but, as best we may gather the facts, however, the parties defendant assaulted had been his friends. The deceased was named Mitchell Walker. The difficulty occurred after night in the store of J. W. Nelson. Nelson and appellant had ordered four quarts of whisky. It came on the train that passed the little station of Bivins between 8 and 9 o'clock at night. When the train came, appellant went over to the depot and got the whisky, as it had been shipped in his name—one quart for himself and three quarts for Nelson. Mitchell and Elmer Walker, brothers, were there, and remarked to appellant that his whisky had come. They all went over, and appellant receipted for the whisky, and took it over to Nelson's store, a short distance away. They went into the store and opened the box, appellant taking out his bottle and opening it. The four took a drink from it. After sitting around a little while, Nelson got one of his bottles, and opened it, and they all took another drink. From this time on the testimony is as widely contradictory and divergent as is possible for testimony to be. Elmer Walker testified that, after sitting there a short while, the appellant remarked that he had ordered the bottle of whisky for his sick wife under the direction of his family physician, and that he must take it over to her, but before going suggested that they take a drink. Elmer Walker says he declined to drink; that the other three did drink, and that he dropped off to sleep, having been up the previous night; that when he waked defendant and his brother, Mitchell, were in a row, and seemed to be fighting, and that he was awakened by the call of his brother, who called him by his nickname "Fuzz"; that he went to where they were, took the bottle of whisky from appellant, and struck him over the head with it, and that appellant, who had been cutting his brother up to that time, turned and chased him and tried to cut him; that he got away from him, and appellant ran to the front door and tried to get out but made a failure, ran to another door, where he, Elmer Walker, threw an axe at him, which stuck in the door, missing appellant. Appellant finally got out of the back door, and went away. Nelson testified, when they took the second drink, he got up, took a lamp, and went to the front of the store on the northwest corner of the house to the post office department—it appears he was postmaster—and went to work on his books; that he heard nothing of the row in the store, if it occurred in the store. The building is about 60 feet long and 28 feet wide. He heard some one groan. By this his attention was attracted, and he inquired what was the matter. This is a remarkable statement, if the physical facts are to be credited, or the testimony of the defendant and Elmer Walker is to be believed. How three men could be engaged in a deadly conflict with knives and bottles, and throwing axes, and running around over the store as they were, and he, Nelson, in the store a few feet of them, and not hear anything about it, is a little peculiar, but such is his testimony. So this witness throws no light on the transaction at all in so far as the difficulty is concerned.

The defendant testified that when he got

up to leave, and announced the fact that his bottle of whisky had been bought for his wife on account of sickness, he suggested before going they would take a drink. The deceased Mitchell Walker said he would not drink his whisky, that he was a damn son of a bitch, and was short, etc. This brought up a colloquy between defendant and Mitchell Walker, in which defendant deprecated the fact that Mitchell Walker saw proper to use the term "son of a bitch," stating his mother was no more of a bitch than was the mother of Mitchell Walker. Mitchell Walker replied that he was a "son of a bitch," or "damn son of a bitch," and Elmer Walker took it up and said that his mother was not a bitch. Defendant told him that he did not say that his mother was, but he ought not to call his mother a bitch, and that his mother was no more a bitch than was the mother of Elmer Walker; and said to them he did not want to have any trouble about it, and suggested that they take a drink and go home. Elmer Walker reached for the bottle as if to take a drink, and immediately struck, and knocked down appellant with it. Defendant says this dazed him, and he did not know anything further until he was getting up from the floor; that somebody was pulling at his back, and he thought they were trying to kill him, and got out his knife and began cutting; that he was blind from the blood and whisky in his eyes, and could not see, and cut at random. The physical facts show that the store was bloody; that the doors at which defendant undertook to escape had blood about them, and one of them had the print of a bloody hand, and, in fact, there was blood all over the floor of the store, around on the counters, on piles of goods and things that were on the counter. Mitchell Walker, the deceased, was badly cut in several places, front and rear. The knife which was used was a pocketknife with a blade about 2½ inches long. The defendant was badly cut about the head and face, and there was a wound or cut on his left shoulder, and he was under the treatment of a doctor some time before he recovered. Mitchell Walker was carried to a sanitarium or hospital at Texarkana, and died in about 24 hours. This is a sufficient statement in regard to the contention that manslaughter should have been charged.

We are of opinion that the question was raised, and that the court, under these facts, should have charged the law of manslaughter, and in not doing so committed such error as will require a reversal of the judgment. As to how the difficulty began seems to be very doubtful. Elmer Walker says he was asleep and did not see the beginning of the difficulty between his brother and the defendant, that they were fighting when he awoke, and that he immediately grabbed the bottle of whisky, and inflicted these various injuries on the appellant. They were rather of a serious nature, and certainly inflicted pain and caused bloodshed. It was also a serious conflict between the parties. The court resolved all the doubt against appellant, and confined the jury to murder in the first and second degree.

[2] Where a state of facts exists favorable to the defendant, which would raise the issue of an inferior degree of homicide not submitted, it is error for the court to fail to so charge the jury. As Elmer Walker describes the difficulty, when he awoke he found his brother engaged in a fight; that he did not know just what they were doing except they were fighting. It developed, he says, later that appellant was using his knife; that he rushed into the difficulty, using the bottle of whisky, inflicting serious bodily injury upon appellant. There were two against one, and serious bodily injury was inflicted. If appellant's testimony is to be credited, Mitchell Walker, immediately upon his brother Elmer striking defendant with the bottle of whisky, reached in his pocket and got his knife, and, after he was struck, he got out his knife. Under appellant's theory, the Walkers were clearly in the wrong in the language used which brought on the difficulty and as testified by him, such language was used for the purpose of provoking the difficulty. While the language "son of a bitch" or "damn son of a bitch" is not adequate cause for manslaughter, yet it may be a provocation to a difficulty. This is not to be questioned under our authorities, and, if the two engaged in a difficulty with him at the time, the adequate cause was plainly shown, and the two parties were acting together under his theory of the case. From any viewpoint of this case the charge on manslaughter should have been given.

There are some other questions suggested for revision, but under this view of the case we are of opinion they will not occur upon another trial.

For the reasons indicated, the judgment is reversed, and the cause is remanded.